**SHIPLEY COMPANY, INC., Plaintiff,**

v.

**Andrew CLARK and Stanley Nolan, Defendants.**

**Civ. A. No. 89–2609–T.**

United States District Court, D. Massachusetts.

Jan. 16, 1990.

Paul W. Johnson, Smith, Duggan & Johnson, Boston, Mass., for plaintiff.

Edward Barshak, Sugarman, Rogers, Barshak & Cohen, Boston, Mass., for defendants.

## MEMORANDUM

TAURO, District Judge.

Plaintiff, Shipley Company, Inc. ("Shipley"), is a Massachusetts corporation engaged in the manufacture and sale of specialty chemical products. Shipley hired defendants Clark and Nolan, both Michigan residents, to work in its Michigan office as account managers and salesmen.

Shortly after Clark and Nolan commenced their employment in 1977 and 1978, respectively, Shipley presented them with new employment contracts containing two restrictive covenants that are at the heart of this case. The first provided that, for one year after their termination, defen-

dants would not compete with Shipley for customers anywhere in the Michigan area.[1] The second prohibited defendants from using or disclosing Shipley's trade secrets and confidential information.[2] The new employment contracts also contained an express choice-of-law provision requiring that they be construed in accordance with Massachusetts law.[3] Defendants signed the new employment contracts on September 25, 1978 and, as directed by Shipley, mailed them to Shipley's Massachusetts headquarters.

Nolan and Clark left Shipley's employ in September and October 1989, respectively, and have since formed their own corporation, Independent Specialty Chemicals, Inc. ("Independent"). Independent distributes plating-on-plastics products manufactured by MacDermaid, Inc., a direct competitor of Shipley's.

Shortly after it was formed, Independent acquired the business of Lacks Industries Inc. ("Lacks"), a Michigan manufacturer of metal-plated plastic parts for cars and appliances, and one of Shipley's largest former clients.[4] According to Shipley, both Nolan and Clark were extensively involved with the Lacks account during their employment with Shipley.

On November 1, 1989, the Vice President of Lacks notified Shipley that it would no longer purchase materials from Shipley and would instead purchase from Independent. Thereafter, Shipley filed this four-count complaint against defendants alleging 1) breaches of the 1-year "no-compete" covenants;[5] 2) breaches of the covenants prohibiting disclosure of trade secrets; 3) common-law misappropriation of trade secrets; and 4) intentional interference with contractual relations.

Presently at issue are Shipley's request for injunctive relief and defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer this case to the United States District Court of Michigan, Western District.

## I.

Defendants contend that dismissal is required here, because they did not transact

---

1. Both defendants' agreements contained the following provision:

   "6. *Noncompetition After Employment.* The employee agrees that, for a period of one year following the termination of his employment, he shall not, without the prior written consent of the Company, directly or indirectly, anywhere in the geographical area in which he has at any time served the Company as a salesman, whether for compensation or not, and whether as principal or as agent, officer, director, employee, consultant, or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, be engaged in, be affiliated with, render services to, own, share in the earnings of, or invest in the stock, bonds or other securities of, any person, firm, corporation or other business similar to or in competition with the specialty chemical business now conducted by the Company ... and ... he shall not, for a period of one year following the termination of his employment, make any solicitation of customers in the geographical area in which he has at any time served the Company...."

   The geographical area in which defendants served as salesmen includes Michigan and other parts of the Midwest.

2. Both defendants' agreements also contained the following provision:

   "2. *Non–Disclosure.* The Employee covenants and agrees that he shall not at any time during or after his employment by the Company reveal, divulge or make known to any person or entity (other than the Company), or use for his own or any other's benefit, the Company's lists of customers and suppliers, or its trade secrets, production processes and materials, formulae, research techniques or accomplishments, or his knowledge of any of the business or financial affairs of the Company, or any other information regarded by the Company as confidential, which during or after his engagement by the Company is made known ... to the Employee by reason of his engagement by the Company...."

3. The choice-of-law provision reads as follows:

   "18. *Governing Law.* This Agreement shall be construed both as to validity and performance and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflict of laws thereof."

4. Lacks purchased $2,000,000 of plating-on-plastics products from Shipley each year, providing Shipley with an annual profit of more than $50,000.

5. It is undisputed that the defendants have violated the no-compete covenants. But, the defendants dispute the validity and enforceability of the no-compete covenants. *See infra* section V.

sufficient business in Massachusetts to justify personal jurisdiction. Shipley argues, however, that jurisdiction over defendants is proper because, in the course of their employment, defendants made regular trips, telephone calls, and mailings to Massachusetts in order to confer with Shipley personnel.

In a diversity case, a federal court has jurisdiction only if a court of the state in which the federal court sits would have jurisdiction. *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 981 (1st Cir.1986); *Gray v. O'Brien*, 777 F.2d 864, 866 (1st Cir.1985). A Massachusetts court may only exercise personal jurisdiction over a foreign defendant when it is authorized by state statute, *and* jurisdiction is consistent with due process. *Ealing Corp.*, 790 F.2d at 981.

The applicable statute is Mass.Gen.L. ch. 223A, § 3, which provides, in relevant part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth....

Mass.Gen.Laws Ann. ch. 223A, § 3 (West 1985).

Part (a) of the statute, the "transacting business" clause, is to be construed broadly. *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 193–94 (1st Cir.1980). Indeed, the First Circuit has held that mailing four letters and making one phone call to Massachusetts satisfied the "transacting business" requirement of § 3(a). *See Bond*

*Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 932 (1st Cir.1985). In order for such activity to satisfy the whole of § 3(a), however, the cause of action must have arisen from the transacted business. *Marino v. Hyatt Corp.*, 793 F.2d 427, 428 (1st Cir.1986).[6] Thus, § 3(a) requires both that defendants transact business in Massachusetts and that the cause of action at issue arose from that activity.

### II.

■ Defendants concede that they made some visits and reports to Massachusetts to consult with Shipley personnel, and that they mailed back their employment contracts to Massachusetts after they signed them. Defendants argue that these activities were required by Shipley as employment duties and, therefore, they do not constitute the purposeful conduct that would satisfy § 3(a). In essence, defendants are relying on the "fiduciary shield" doctrine, that protects an individual from jurisdictional consequences because of acts performed in his capacity as a corporate representative. *See Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 573 F.Supp. 1106 (D.Mass.1983).

Defendants' argument is unavailing. No Massachusetts court has ever recognized the fiduciary shield doctrine as a limitation on the reach of the long-arm statute. *Id.* at 1111. Indeed, no Massachusetts court has ever recognized the doctrine at all. *See Yankee Group, Inc. v. Yamashita*, 678 F.Supp. 20, 22 (D.Mass.1988) (noting "the absence of any authority indicating that Massachusetts recognizes the fiduciary shield doctrine ..."). Defendants' visits and reports to Shipley in Massachusetts, and the mailing of the employment contracts, qualify as "transacting business" for purposes of § 3(a).

■ The more difficult question is whether the cause of action arose out of defendants' "transaction of business." Although the term "arising from" does not

---

**6.** *Cf. Vencedor Mfg. Co., Inc. v. Gougler Industries*, 557 F.2d 886, 889 (1st Cir.1977) ("When a cause of action arises from the defendant's con-

tacts within the forum, less is required to support jurisdiction than when the cause of action is unrelated to those contacts").

have a precise meaning,[7] one case held that the "arising from" requirement was not satisfied where the cause of action was for personal injuries and the business transacted was the formation of a contract. *Marino v. Hyatt Corp.*, 793 F.2d 427 (1st Cir. 1986).[8] On the other hand, another case held that the "arising from" requirement was satisfied where the cause of action was for breach of contract and the business transacted was the formation of the contract. *Hahn v. Vermont Law School*, 698 F.2d 48 (1st Cir.1983).[9]

The *Hahn* case is most directly applicable here. The cause of action is one for breach of contract. One of defendants' "business transactions" was the mailing of the contracts which, as in *Hahn*, was the basis of the underlying cause of action. Here, the cause of action arose from the business transacted, and the jurisdictional requirements of § 3(a) are satisfied.

## III.

■ The inquiry into personal jurisdiction does not end there. For jurisdiction to be proper, constitutional requirements of due process must be met. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2181–82, 85 L.Ed.2d 528 (1985). To satisfy these requirements, "defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being hailed into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

For due process purposes, it is not necessarily enough that a nonresident enters into a single commercial contract with a resident of the forum state. *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 933 (1st Cir.1985). To justify jurisdiction, the defendant must "fairly be said to have participated in the economic life of Massachusetts." *Id.* Only when there are such contacts, in addition to the mere fact of the contract (a so-called "contracts-plus" requirement), is jurisdiction proper. *Id.*

Although defendants each entered into only one contract, there was enough additional activity to satisfy the "contracts-plus" requirement. In addition to their mailing of the contracts to Massachusetts, the very nature of the contracts—employment contracts—contributes to placing defendants on notice of the possibility of suit in Massachusetts. Defendants worked for a Massachusetts company, and this factor is more than that with which the *Bond* court was concerned when it created the "contracts-plus" requirement.[10] The contract in this case even contained language that the laws of Massachusetts would govern the contract's interpretation, thus providing further notice of the possibility of suit here. Furthermore, by receiving salaries from a Massachusetts employer, defendants can fairly be said to have "participated in the economic life of Massachusetts." Indeed, the sole purpose of their employment was to generate revenue for a

---

**7.** *See Hahn v. Vermont Law School*, 698 F.2d 48, 51 (1st Cir.1983) ("[T]he Massachusetts courts have not defined the scope of the "arising from" requirement of the long-arm statute...."). At least one judge in this Circuit relies on a definition of "arising from" as "analogous to the issue of proximate cause in tort law." *Russo v. Sea World of Florida, Inc.*, 709 F.Supp. 39, 42 (D.R.I. 1989) (Lagueux, J.).

**8.** *Marino* involved a husband and wife who were injured while at a Hyatt Hotel in Hawaii. They sued Hyatt, a Rhode Island corporation, in Massachusetts and based their theory of personal jurisdiction on the contract for reservations which was entered into in Massachusetts. The First Circuit disagreed because the personal injury did not arise from the formation of the contract. *Id.* at 431.

**9.** *Hahn* involved a Massachusetts resident who sued the Vermont Law School for flunking him in a course, allegedly in breach of the contract of admission. The court found that the cause of action of breach of contract arose from the formation of the contract of admission, and that the mailing of an acceptance letter constituted the transaction of business for purposes of § 3(a). *Id.* at 51.

**10.** *Bond*'s "contracts-plus" rule arose out of "a special concern for formulating a jurisdictional rule that would protect wholly passive purchasers, who do no more than place an order with an out of state merchant and await delivery." 764 F.2d at 933. In contrast, choosing to work for a Massachusetts employer is more "active" than what the *Bond* court had in mind.

Massachusetts company. Finally, defendants' reports and visits to Massachusetts were done in furtherance of the contract. Rather than merely signing a contract with a Massachusetts resident, defendants actually visited the state in furtherance of that contract.[11] Taken together, these factors all suggest that defendants had reasonable notice that they might be sued in Massachusetts.[12] Therefore, due process is satisfied and jurisdiction pursuant to § 3(a) would not "offend traditional notions of fair play or substantial justice." *See International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945).[13]

Accordingly, defendants' motion to dismiss for lack of personal jurisdiction is denied.

### IV.

■ Defendants move, alternatively, that this this case be transferred, pursuant to 28 U.S.C. § 1404(a), to the United States District Court of Michigan, Western District.

A district court may, "[f]or the convenience of parties and witnesses" and "in the interest of justice," transfer a civil action to any other district where it may have been brought originally. 28 U.S.C. § 1404(a). The overriding principle in any transfer analysis, however, is that "the plaintiff's choice of forum is entitled to great weight." *Home Owners Funding Corp. of America v. Century Bank*, 695 F.Supp. 1343, 1347 (D.Mass.1988). The burden is thus on defendants to show that a transfer is warranted. *Id.*[14]

The first requirement for a § 1404(a) transfer—that the Western District of Michigan be a forum where the action may have been brought initially—is satisfied here because defendants are Michigan residents. As such, venue would have been proper there. *See* 28 U.S.C. § 1391(a).

As for the convenience to the witnesses,[15] defendants claim that all of the essential evidence and witnesses are in Michigan. It is true that defendants' business operations, and the clients for which they are allegedly competing, are in Michigan. Furthermore, the cost of transporting these witnesses to Massachusetts would be significant.

Nevertheless, defendants fail to meet their burden here. First, "[w]hen a party seeks the transfer on account of the conve-

---

**11.** Defendants contend that the visits and reports to Massachusetts should not be considered in the due process analysis because they were not contemplated at the time the agreements were signed. Rather, according to defendants, their contacts with Massachusetts were the result of Shipley's unilateral decision, after the agreements were signed, to require defendants to report to Massachusetts. Even if this were true, however, the other factors discussed above were sufficient to place defendants on notice of the possibility of suit in Massachusetts.

**12.** Even though all of these supplemental factors relate to the contract, it would be inconsistent with the previous discussion of the "fiduciary shield" doctrine to say that the "contracts-plus" requirement is not met here. To say that activities required by an employment contract are not "supplemental" is effectively to validate the fiduciary shield doctrine which, as noted above, Massachusetts does not recognize.

**13.** Defendants also argue that the employment contracts at issue were signed *after* they had already started working for Shipley, and that, when they first began working for Shipley, they were not required to go to Massachusetts. De-

fendants thus rely on *Cadman v. Bond,* 603 F.Supp. 1335, 1337 (D.Mass.1985) which held that there was no jurisdiction where defendants were forced to correspond with Massachusetts plaintiffs regarding pre-existing contractual obligations because of the plaintiffs' fortuitous move into Massachusetts.

The *Cadman* case is inapposite, however. In addition to the immediately apparent distinction here that Shipley has always been in Massachusetts, there is some suggestion that defendants had some correspondence with Massachusetts before the new employment contracts were signed. Furthermore, their decision to enter into the new contracts was voluntary, so they were not "forced" to correspond with a Massachusetts plaintiff.

**14.** "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

**15.** This is perhaps the most important inquiry. *See Homeowners Funding Corp. of America v. Century Bank,* 695 F.Supp. 1343, 1347 (D.Mass. 1988).

nience of witnesses ..., he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Brant Point Corp. v. Poetzch,* 671 F.Supp. 2, 4 (D.Mass. 1987) quoting *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978). Here, defendants merely allege that "all of the essential evidence and witnesses are located in or near Michigan." *Memorandum In Support Of Defendants' Motions To Dismiss Or For Transfer,* p. 16. Such a bald assertion is insufficient. Second, Shipley has submitted an affidavit representing that Shipley will be calling several witnesses who live in Massachusetts. *Affidavit of Paul W. Johnson,* p. 2. Defendants' claim of inconvenience, therefore, is no greater than Shipley's.[16]

As for the convenience to the parties, defendants argue that, given their tenuous relationship to Massachusetts, the presumption favoring Shipley's choice of forum is entitled to less weight. Defendants also claim that the transfer to Michigan is not burdensome to Shipley, because it has an active business there with at least one office. Conversely, defendants have no contacts or business in Massachusetts, and claim that they are financially limited in their ability to travel to Massachusetts regularly.[17]

Defendants seem to tip the balance in their favor on this question. Shipley's only argument here is that, while it does have an office in the Eastern District of Michigan, the office only consists of one secretary and one salesman. Even so, it appears to be more expensive for defendants to be in Massachusetts than it is for Shipley to be in Michigan.

As for the interest of justice, defendants point again to the relative access to proof and witnesses in Michigan as opposed to Massachusetts, and the likelihood of enforcement of a Michigan judgment. Defendants also point to Michigan's interest in overseeing business dealings in-state, which include the alleged violations here.

Defendants fail to mention, however, Massachusetts' interest in protecting its companies from breaches of contracts, or that the contract's choice-of-law provision calls for the application of Massachusetts law. Their only mention of this latter fact is made in their argument, set forth in their opposition to Shipley's request for injunctive relief, that Michigan law applies because Michigan's public policy against restrictive covenants voids a contract's choice-of-law provision.[18]

A transfer here would not serve the interest of justice. First, Massachusetts has as legitimate an interest in protecting its companies from breaches of contract as Michigan has in protecting its economy from the anti-competitive effects of restrictive covenants. Second, for the reasons set forth below in the discussion of Shipley's motion for injunctive relief, Massachusetts law rather than Michigan law governs the interpretation of this contract.[19] Consequently, there is a strong judicial interest in keeping the case in Massachusetts.[20]

Defendants, therefore, fail overall to tip the balance of convenience and justice strongly in their favor. Accordingly, their motion to transfer this case to Michigan is denied.

## V.

Shipley moves this court to enjoin defendants from violating the restrictive covenants in their employment agreements, from intentionally interfering with Ship-

16. *See Berrigan v. Greyhound Lines, Inc.,* 560 F.Supp. 165, 169 (D.Mass.1982) (transfer should not merely shift the inconvenience to the plaintiff).

17. During a hearing on December 11, 1989, defendants represented that their company is in financial straits.

18. *See infra,* section V.

19. *See infra,* section V.

20. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) ("There is an appropriateness ... in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself").

ley's contractual relations with its customers, and from misappropriating Shipley's trade secrets.

For a party to obtain injunctive relief, it must establish that it is likely to prevail on the merits of its claims, it will suffer irreparable injury in the absence of injunctive relief, the injury to plaintiff outweighs any harm which granting injunctive relief would inflict on defendants, and the public interest would be served by an issuance of an injunction. *See Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir.1986). Because Shipley alleges breaches of two separate contract provisions—the no-compete covenants and the covenants prohibiting disclosure of trade secrets and confidential information—the request for injunctive relief will be analyzed in two corresponding parts.

### A. The No-compete Covenants

█ Shipley has successfully shown that it is likely to succeed on the merits here. Both parties agree that defendants are violating the no-compete covenants. The only issue in dispute is whether Michigan or Massachusetts law applies and, accordingly, whether the covenants are enforceable.

A federal court hearing a case in diversity must apply the choice-of-law rules of the forum state. *Klaxon v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Massachusetts courts give effect to the law reasonably chosen by the parties to govern their rights under contracts. *Morris v. Watsco, Inc.*, 385 Mass. 672, 674–75, 433 N.E.2d 886, 888 (1982). The parties here have specified that Massachusetts law applies to this contract's interpretation.

The parties' choice-of-law provision will not be honored, however, where its application "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the

applicable law in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws, § 187(2)(b) (1971).[21]

Defendants acknowledge that their contracts specifically provide for the application of Massachusetts law. They argue, however, that Michigan has a strong public policy against no-compete agreements and, therefore, a Massachusetts court would not enforce this choice-of-law provision as to the validity of the no-compete covenants. Defendants have noted a case which held that, as to employment contracts between out-of-state employers and Michigan employees, a plaintiff cannot enforce a no-compete clause in Michigan, even where the agreement provides for the application of another state's laws. *Comshare, Inc. v. Execucom Systems Corp.*, 593 F.Supp. 981 (E.D.Mich.1984). Michigan's public policy against such covenants, according to defendants, thus overrides an express choice-of-law provision. *Id.*

In order to qualify for the Restatement's exception to the rule of respecting choice-of-law provisions, however, three conditions must be met: a) Michigan must have a fundamental policy against no-compete agreements; b) Michigan must have a materially greater interest than Massachusetts in the determination of the issue; and c) Michigan law would have applied in the absence of the express provision. Restatement (Second) of Conflict of Laws, § 187(2)(b) (1971).

At the time of the *Comshare* decision, Michigan had a clear and strong policy against no-compete agreements. Michigan had a statute which voided all no-compete agreements, whether reasonable or unreasonable. Mich.Comp.Laws § 445.761 (1979). That statute was repealed in 1985, however, and the current statute provides:

(1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in

21. *Cf. Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, (1982), which upheld the validity of a choice-of-law provision. *Watsco* did not involve a "fundamental policy" of any state that might be threatened by enforcement of the provision, however.

employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

(2) This section shall apply to covenants and agreements which are entered into after March 29, 1985.

Mich.Comp.Laws Ann. § 445.774a (West 1989). Michigan, therefore, can no longer be said to have a strong public policy against no-compete agreements.

Defendants argue, however, that Michigan still has a strong policy against no-compete agreements, such as those in this case, that were entered into *before* 1985. The statute clearly provides that the new policy only applies to contracts made after March 29, 1985, and Michigan courts continue to void agreements that would have been void before the repeal of the old statute. *See Burns Clinic Medical Center v. Vorenkamp*, 165 Mich.App. 224, 418 N.W.2d 393 (1987); *Compton v. Joseph Lepak, D.D.S.*, 154 Mich.App. 360, 370–72, 397 N.W.2d 311 (1986).

■ While defendants' argument has some force, it fails to recognize the critical distinction between Michigan's public policy and Michigan's law. If Michigan *law* were to apply, the covenants would be invalid, because the contracts are pre–1985. But here, we are applying *Massachusetts'* choice-of-law rules.[22] Accordingly, the proper inquiry under Massachusetts choice-of-law rules is whether Michigan has a fundamental *public policy* that would be

frustrated by the application of Massachusetts' substantive law, and *not* whether a Michigan court would void the covenant pursuant to a statute. Michigan has expressed its current view that it is no longer bothered by in-state restraints on competition imposed by reasonable no-compete agreements. Enforcement of the choice-of-law provision, therefore, would violate Michigan *law*, but not Michigan *policy*. It is only the latter that is relevant here. Because Michigan no longer has a public policy against no-compete agreements, therefore, defendants fail to satisfy the first of the three conditions to qualify for the exception to the rule enforcing choice-of-law provisions.

Even if the first condition were satisfied, however, Michigan's interest in the resolution of this issue is not "materially greater" than Massachusetts'. While Michigan certainly has a strong interest in monitoring effects on in-state competition, Massachusetts has an equally strong interest in protecting Massachusetts businesses from breaches of employment agreements and consequent losses of good will.

Having failed to satisfy the three conditions for the exception to the general rule enforcing parties' express choice-of-law provisions, defendants are bound by the provision in the contract calling for the application of Massachusetts law.[23]

■ Under Massachusetts law, no-compete covenants will be enforced to the extent that they reasonably protect the legitimate business interests of the employer. *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 287, 310 N.E.2d 915, 920 (1974); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778, 308 N.E.2d 481, 485 (1974); *Alexander & Alexander, Inc. v. Danahy*, 21 Mass.App.Ct. 488, 498, 488 N.E.2d 22, 29 (1986). No-compete covenants restraining

---

**22.** It should be noted that this reference is not to Massachusetts' law as to the validity of no-compete agreements generally, but rather to Massachusetts' choice-of-law rules, as required by *Klaxon v. Stentor.*

**23.** It is also worth noting the unfairness that would result from permitting defendants to escape a contract provision that they presumably

adopted in good faith. Some of the most important factors to consider in any choice-of-law analysis are the protection of justified expectations and predictability of result. Restatement (Second) of Conflict of Laws, § 6 (1971). It is reasonable to assume that, when the parties entered into the agreements, they expected the choice-of-law provision to be valid.

former salesmen have been construed as reasonable to protect legitmate business interests. *See Kroeger v. The Stop & Shop Companies, Inc.*, 13 Mass.App.Ct. 310, 316, 432 N.E.2d 566, 570 (1982) ("[S]alesmen or sales managers have the capacity to injure the good will of their former employees"). Indeed, Massachusetts courts have enforced as reasonable certain no-compete covenants that were even more restrictive than the one in this case. *See Marine Contractors*, 365 Mass. at 290, 310 N.E.2d at 921 (three-year restriction reasonable); *All Stainless*, 364 Mass. at 779–81, 308 N.E.2d at 486–87 (two-year restriction with geographical restriction limited to former employee's sales territory was reasonable). Because defendants are clearly violating the no-compete covenants, Shipley has established a likelihood of success on the merits.

The next requirement for injunctive relief is that the harm to Shipley, absent an injunction, be irreparable. Certainly, as to any unknown or future violations of the covenants by defendants, Shipley's loss of "good will" is irreparable. *See Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass. App.Ct. 310, 432 N.E.2d 566, 573 (1982). ("[T]he task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one."). Furthermore, it would be difficult, if not impossible, to determine which of the other clients defendants may generate within the year would have otherwise gone to Shipley for business.

As for defendants' acquisition of the Lacks account, however, the damages are readily assessable. Shipley could simply bring a breach of contract action against defendants for the amount of the business that Lacks gives to defendants during this year. It is true, as noted above, that the lost "good will" is not as easily quantified.

But, even if an injunction were to issue and Shipley were subsequently to seek a contempt order for violations of the injunction, Shipley would encounter the same proof problems. An injunction here would simply restate defendants' obligation to obey the contract. Furthermore, Shipley has not made a sufficient showing that it, in fact, suffered a loss of good will as a result of defendants' acquisition of the Lacks account. Indeed, defendants have submitted an affidavit from the Vice President of Lacks in which he states that Lacks had decided to stop buying from Shipley even before defendants started their own business.[24]

As for the balance of harms, the scale tips in favor of Shipley, but again not with respect to the Lacks account. As for all prospective clients other than Lacks, the harm to Shipley without an injunction would be greater than the harm to defendants with an injunction. Without an injunction, defendants can risk soliciting other clients in violation of the no-compete agreements, and plaintiff may find it impossible to prove later that, had defendants not competed for business, those clients would have gone to Shipley. Shipley, therefore, would be left with nothing more than emasculated employment contracts. With an injunction, however, Shipley would be protected from further violations,[25] and defendants would be no more restrained than they are by their current employment agreements.

Again, however, the Lacks account is a different matter. If it is true, as Thomas Gavin's affidavit asserts, that Lacks will not renew business relations with Shipley in any event, Shipley would gain nothing from an injunction preventing defendants from dealing with Lacks. Conversely, defendants would suffer greatly by losing a substantial client for one year. An injunc-

---

**24.** Shipley claims that this statement is simply incredible, but, as it bears the burden of establishing its right to obtain injunctive relief, it needs to do more to discredit the affidavit than plead incredulity.

**25.** The proof problems noted above as to "good will" would not be present here. If defendants were enjoined from doing business in Michigan,

all Shipley would need to prove to obtain a contempt order is that defendants conducted business, in violation of the injunction. Shipley would not have to prove that defendants' violation attracted clients that would otherwise have gone to Shipley or that Shipley suffered a loss of good will.

tion, therefore, would benefit no one other than the fortunate third-party to whom Lacks would be forced to turn.

Accordingly, with respect to the no-compete covenants, Shipley's motion for injunctive relief is partially allowed. Defendants are enjoined from any further violations of the no-compete agreements, but are not enjoined from their continued business relations with Lacks.[26]

### B. The Prohibition on Disclosures

■ This covenant is a somewhat different matter because Shipley has not established a likelihood of success on the merits. The complaint alleges only general violations of this covenant: "On information and belief, defendants have also engaged in activity prohibited by section 2 of the Employment Agreements [the prohibition on disclosure of trade secrets]." No more is alleged and no more evidence is offered. Furthermore, defendants contend that any expertise they have in their present business came, not by virtue of exposure to Shipley's secrets, but from a familiarity with the industry that they already possessed before they worked for Shipley.

Having failed to establish a likelihood of success on the merits, Shipley is not entitled to injunctive relief with respect to the covenants prohibiting disclosures of trade secrets and confidential information.[27]

### VI.

Accordingly, defendants Motion To Dismiss Pursuant To Fed.R.Civ.P. 12(b)(2) Or For Transfer To The United States District Court Of Michigan, Western District is denied. Plaintiff's motion for injunctive relief is allowed in part, and only to the following extent: Defendants are enjoined from any further violations of the no-compete covenants in their employment agreements, but they are permitted to maintain their business relations with Lacks, at their peril. Plaintiff's motion is denied in all other respects.

An order will issue.

---

**26.** The decision not to enjoin defendants from continuing to service Lacks as a client should in no way be construed as a judgment that such a continued business relationship is not in violation of the no-compete covenants.

**27.** Shipley also asks this court to enjoin defendants' alleged intentional interference with Shipley's contractual relations with its customers and defendants' alleged misappropriation of Shipley's trade secrets. Shipley offers no evidence of any interference with contractual relations, however. To the extent that Shipley bases this claim on the same conduct constituting the breaches of the no-compete agreements, the holding as to the no-compete agreements shall subsume Shipley's request for an injunction as to the alleged intentional interference with contractual relations.

Similarly, Shipley offers no evidence of misappropriation of trade secrets other than that mentioned with regard to the covenants prohibiting disclosures of trade secrets. The holding as to the covenants prohibiting disclosures shall thus subsume Shipley's request for an injunction as to the alleged misappropriation of trade secrets.