**BIO–IMAGING TECHNOLOGIES, INC., Plaintiff,**

**v.**

**Thomas MARCHANT, Defendant,**

**M2S, Inc., Intervenor Defendant.**

**Civil Action No. 08–11277–NMG.**

United States District Court, D. Massachusetts.

Sept. 24, 2008.

**324**

Sonya S. Collins, John F. Tocci, Tocci, Goss & Lee, PC, Boston, MA, for Defendant.

Todd S. Holbrook, Morgan Lewis & Bockius LLP, Boston, MA, Prashanth Jayachandran, Thomas A. Linthorst, Morgan, Lewis & Bockius LLP, Princeton, NJ, for Plaintiff.

Katherine E. Perrelli, Seyfarth Shaw, LLP, Boston, MA, for Intervenor Defendant.

### MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Bio–Imaging Technologies, Inc. ("Bio–Imaging") asserts claims for breach of contract, unfair competition and misappropriation of trade secrets against defendant Thomas Marchant ("Marchant"), a former employee. Bio–Imaging has moved for a preliminary injunction to prevent Marchant from violating the terms of restrictive covenants by commencing certain specific employment with M2S, Inc. ("M2S"), an alleged competitor.

### I. *Background*

#### A. **Factual Background**

Bio–Imaging provides medical imaging core laboratory services for clinical trials. Clinical trials are conducted by life sciences companies to collect data on the safety and efficacy of their drugs and devices for purposes of obtaining regulatory approval of their products. Such trials involve the use of medical images such as x-rays, ultrasounds, CT scans and MRIs. Bio–Imaging provides imaging services to companies conducting clinical trials, including image collection, quality reviews and image analysis. It offers such services for clinical trials covering all therapeutic areas and for all kinds of clinical trials, including those known in the industry as Phase I, II, III and IV trials (which refers to the stages of approval that drugs and devices obtain from the Food and Drug Administration).

Bio–Imaging takes a number of precautions to protect its confidential information. It requires all employees to sign confidentiality agreements and many employees are required to sign non-competition and non-solicitation agreements. Before submitting proposals to customers, Bio–Imaging requires that they sign non-disclosure agreements and customer proposals include a confidentiality legend.

In 1997, Marchant was hired by Bio–Imaging as "Manager, Clinical Trial Services—Northeast Region". The duties of that position included developing clients. At the time he was hired, Marchant signed an "Invention Assignment and Confidential Information Agreement" ("the Confidential Information Covenant") and a "Non–Competition Agreement" ("the Non–Competition Covenant"), which included a non-solicitation clause ("the Non–Solicitation Covenant") (together "the Restrictive Covenants").

In accordance with the Confidential Information Covenant, Marchant agreed not to use or disclose confidential information during or after his employment with Bio–Imaging. Confidential information is defined to include

innovations, business strategies, financial information, forecasts, personnel information, customer lists, trade secrets and any other non-public technical or business information ... which I [Marchant] know or have reason to know [Bio–Imaging] would like to treat as confidential for any purpose, such as maintaining a competitive advantage or avoiding undesirable publicity.

The Confidential Information Covenant explicitly states that it does not apply to information that has become known to the public or information that Bio–Imaging regularly gives to third parties without restrictions on use or disclosure.

Pursuant to the Non–Competition Covenant, Marchant agreed not to engage in business competitive with Bio–Imaging during his employment and for a period one year thereafter in

any state of the United States or any country in the world in which [Bio–Imaging] or any affiliate of [Bio–Imaging] carries on or engages in the business of [Bio–Imaging].

The Non–Solicitation Covenant provides that Marchant will not "solicit or contract [sic] any customer or potential customer of [Bio–Imaging]" for a period of one year after his employment. All three of the Restrictive Covenants were made in consideration of Marchant's continued employment at Bio–Imaging. The Restrictive Covenants all provide that they will be governed by the laws of New Jersey.

Marchant also signed an offer letter from Bio–Imaging when he accepted employment with the company. Among other things, that letter stated that:

During the first six months of your employment you shall receive a recoverable draw based on an expected annual commission payout of $40,000.

In 2000, Marchant assumed a new position at Bio–Imaging as "Director of Business Development". In that role his duties included identifying new business opportunities, developing business and maintaining client relationships. During his employment at Bio–Imaging, Marchant worked out of his home and was responsible for the Northeast Region (the New England states and New York) and several states in the Midwest. His compensation was based, in part, on commissions and therefore fluctuated. Bio–Imaging paid Marchant approximately $135,000 in 2007, and approximately $170,000 in both 2006 and 2005. During the 11 years he was employed by Bio–Imaging, Marchant earned nearly $1.5 million.

While at Bio–Imaging Marchant had access to and knowledge of Bio–Imaging's pricing, sales strategies and customer relationships, presentations and proposals. He participated in sales meetings in which Bio–Imaging's marketing plan and "S.W.O.T." analysis were discussed. The "S.W.O.T." analysis was an assessment of the strengths, weaknesses, opportunities and threats facing Bio–Imaging's business.

On July 18, 2008, Marchant gave notice of his intent to resign from Bio–Imaging and within four days of his resignation he was asked to return all company property. Marchant asked to keep his company cell phone number because it was used by family and personal contacts and Bio–Imaging acquiesced to that request. Marchant was also permitted to maintain his Blackberry device until his service could be transferred to another phone.

At the time of his resignation, Marchant informed Bio–Imaging that he had accepted employment with M2S, which, according to its website, "provides comprehensive core lab and imaging management services for clinical trials across all therapeutic ar-

eas". It advertises that its services extend from "Phase I to Phase IV studies".

Marchant was hired by M2S to become its Director of Business Development. The duties of that position include securing new business and maintaining relationships with M2S' clinical trials customers. On August 18, 2008, with Bio–Imaging's consent, Marchant commenced employment with M2S in a non-competitive capacity pending the outcome of Bio–Imaging's motion for preliminary injunction.

Bio–Imaging argues that by assuming the position of Director of Business Development at M2S, Marchant will be breaching the Restrictive Covenants and thereby causing irreparable harm to Bio–Imaging. It asks this Court to enjoin Marchant from commencing any competitive employment at M2S and thereby breaching the Restrictive Covenants.

### B. Procedural History

On July 25, 2008, plaintiff Bio–Imaging filed a complaint alleging counts of breach of contract, unfair competition and misappropriation of trade secrets against defendant Marchant. On August 15, 2008, M2S filed an unopposed motion to intervene as of right as a defendant. Thereafter, Bio-Imaging filed an amended complaint which both Marchant and M2S answered.

Bio–Imaging filed the pending motion for preliminary injunction on August 19, 2008, and a joint opposition was filed by Marchant and M2S (together "the Defendants") shortly thereafter. Subsequently, the parties filed reply and sur-reply briefs and a hearing on the matter was held on September 5, 2008.

## II. *Legal Analysis*

### A. Legal Standard

■ The federal preliminary injunction standard applies in diversity cases, at least where the parties have not suggested that state law supplies meaningfully different criteria. *Lanier Prof'l Servs., Inc. v. Ricci,* 192 F.3d 1, 3 (1st Cir.1999) (citing *Ocean Spray Cranberries, Inc. v. PepsiCo, Inc.,* 160 F.3d 58, 61 (1st Cir.1998)). To obtain preliminary injunctive relief under Fed.R.Civ.P. 65, a movant must demonstrate

(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.

*Nieves–Márquez v. Puerto Rico,* 353 F.3d 108, 120 (1st Cir.2003) (citation omitted). Likelihood of success on the merits is the critical factor in the analysis. *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993) (citations omitted).

### B. Analysis

#### 1. Likelihood of Success on the Merits

■ Bio–Imaging argues that it is likely to succeed on the merits in its breach of contract claim. Marchant and M2S respond that Marchant is neither violating a valid restrictive covenant nor has he disclosed any confidential information.

##### a. Applicable Law

■ Although this Court applies federal law to the preliminary injunction standards, in determining the likelihood of success on the merits it applies state law governing restrictive covenants. *See Lanier,* 192 F.3d at 4 (applying Massachusetts law to evaluate likelihood of success on the merits). In a diversity case, a federal court must apply the choice-of-law rules of the forum state. *Shipley Co. v. Clark,* 728 F.Supp. 818, 825 (D.Mass.1990) (citation omitted). Massachusetts courts give effect to the "law reasonably chosen

by the parties to govern their rights under contracts". *Id.* (citation omitted). A choice-of-law provision will not be honored, however, if its application

would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in determination of the particular issue.

*Id.* (quoting Restatement (Second) of Conflict of Laws, § 187(2)(b) (1971)).

It is undisputed that the Restrictive Covenants here provide for the application of New Jersey law. Furthermore, as both parties acknowledge, the law relevant to this motion in both Massachusetts and New Jersey is substantially similar. Applying New Jersey law would not be contrary to any fundamental policy of Massachusetts and this Court will, therefore, do so.

### b. Enforceability of the Restrictive Covenants

■■ In New Jersey, a restrictive covenant is enforceable to the extent that it is "reasonable under the circumstances". *Karlin v. Weinberg*, 77 N.J. 408, 390 A.2d 1161, 1166 (1978). A covenant is reasonable where it "simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public". *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 56 (1970) (citation omitted). The Defendants assert that the Restrictive Covenants 1) do not protect a legitimate interest, 2) are overbroad in scope and 3) have been rendered unenforceable by a dramatic change in circumstances.

### i. Protectable Interests

■ New Jersey recognizes proprietary and confidential information and customer relationships as legitimate interests protectable through restrictive covenants. *Platinum Mgmt., Inc. v. Dahms*, 285 N.J.Super. 274, 666 A.2d 1028, 1038 (N.J.Super. Ct. Law Div.1995) (citing *Solari*, 264 A.2d at 56). In this case, Bio–Imaging has demonstrated that the Restrictive Covenants protect both confidential information and customer relationships.

A substantial part of Marchant's job at Bio–Imaging related to customer relationships. He was responsible for identifying new business opportunities, developing business and maintaining client relationships. By virtue of employing Marchant, Bio–Imaging invested substantial resources in soliciting and maintaining customers. *See id.* at 1039 (citing *A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J.Super. 426, 524 A.2d 412, 416 (N.J.Super.Ct.App.Div.1987)); *cf. Coskey's Television & Radio Sales Serv., Inc. v. Foti*, 253 N.J.Super. 626, 602 A.2d 789, 790, 794–95 (N.J.Super.Ct.App.Div.1992) (injunction inappropriate where employee's customer relationships were developed *before* he commenced employment for the plaintiff). Bio–Imaging has an interest in protecting its customer relationships that were established during Marchant's employment and has reasonably done so through the use of the Restrictive Covenants.

Bio–Imaging has also demonstrated that the Restrictive Covenants protect confidential information to which Marchant was privy. In his position as Manager of Clinical Trials, and later as Director of Business Development, Marchant had access to and knowledge of Bio–Imaging's pricing, sales strategies and customer relationships, presentations and proposals. Marchant admits that "some" of the information to which he had access was confidential. Bio–Imaging protected that confidential information through restrictive covenants with employees and non-disclosure agreements with customers. Protecting such information is a legitimate in-

terest of Bio–Imaging and renders its use of the Restrictive covenants reasonable. *See Platinum Mgmt.*, 666 A.2d at 1038 (restrictive covenant valid where employee "had access to [company's] pricing policy and sales strategy"); *cf. Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577, 583 (1971) (injunction not warranted because employers assertions of confidential information were "doubtful" and "flatly and fully denied").

■ Defendants argue that Bio–Imaging lacks a protectable interest because much of the information Marchant has is publicly available or of little value to competitors. Under New Jersey law, however, information that is otherwise publicly available may still be protectable. *Platinum Mgmt.*, 666 A.2d at 1038 (that such information may be available from public sources does not mean that it is not confidential as between the parties, citing *Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1410 (3d Cir.1985)). Furthermore, much of the information Marchant had access to, such as the "S.W.O.T." analyses, could be of significant value to a competitor.

Defendants also contend that Bio–Imaging failed to protect its confidential information adequately, thereby making it unprotectable. Bio–Imaging has demonstrated, however, that it jealously guards the information to which Marchant had access through the use of restrictive covenants and non-disclosure agreements. To that end, it promptly requested that Marchant return all company property after he resigned. The fact that Marchant was permitted to retain his cell phone number for personal use does not negate the confidential nature of the information Bio–Imaging seeks to protect.

### ii. Scope of the Restrictive Covenants

In addition to protecting legitimate business interests, the Restrictive Covenants at issue are reasonable in scope. New Jersey has routinely upheld restrictions of one year and defendants do not challenge the temporal restriction in the Non–Competition Covenant. *See, e.g., id.* at 1033, 1037 (one year restriction upheld).

Defendants do assert, however, that the geographic scope of the Non–Competition Covenant is overbroad. The Non–Competition Covenant prohibits Marchant from competing in any state or country where Bio–Imaging does business. Under New Jersey law, similarly broad geographic restrictions have been upheld. *See, e.g., Scholastic Funding Group, LLC v. Kimble*, No. 07–557, 2007 WL 1231795, at *5, 2007 U.S. Dist. LEXIS 30333, at *14 (D.N.J. Apr. 24, 2007) (covenant with no geographic limitation upheld because "telemarketing industry is broad-ranging in its scope by the nature of its business"); *Mansol Indus., Inc. v. Singh*, No. 96–2065, 1996 U.S. Dist. LEXIS 22823, at *33 (D.N.J. Sept. 25, 1996) (world-wide covenant reasonable where "industry involves a world-wide market"). The geographic scope of the Restrictive Covenants is therefore reasonable.

Defendants also argue that the extent of the Non–Solicitation Covenant is overbroad. The Non–Solicitation Covenant provides that Marchant will not "solicit or contract [sic] any customer or potential customer" of Bio–Imaging for a period of one year. New Jersey precedent suggests that such a provision is overbroad. *See Platinum Mgmt.*, 666 A.2d at 1039 (covenant overbroad to the extent that it "covers prospective customers that were only solicited by" former employer) (citation omitted). Bio–Imaging has suggested that the subject provision ought to be upheld if read to include only those customers with whom Marchant had contact while employed by Bio–Imaging. Under such a reading the restriction is reasonable and,

for the purposes of this injunction, this Court will therefore interpret "potential customers" to include only those customers with whom Marchant had contact while employed at Bio–Imaging. *See Solari*, 264 A.2d at 61 (permitting total or partial enforcement of restrictive covenants to the extent reasonable under the circumstances).

### iii. Change of Circumstances

Defendant argues that the Restrictive Covenants are not applicable to Marchant because they were executed under dramatically different circumstances than those that exist today. Specifically, Defendants argue that Marchant's position at Bio–Imaging, as well as Bio–Imaging's business and the medical imaging industry itself, have changed dramatically since he was hired.

As an initial matter, the fact that Bio–Imaging's business and the medical imaging industry grew substantially during Marchant's tenure does not support the conclusion that the Restrictive Covenants are no longer enforceable. Although the company expanded, its line of business remained the same.

Nor did Marchant's role at Bio–Imaging undergo any dramatic change. During his employment, Marchant's title changed from Manager of Clinical Trial Services to Director of Business Development but his responsibilities remained essentially constant. There were sales aspects to both positions and, throughout his tenure at Bio–Imaging, Marchant was responsible for developing client relationships. The Restrictive Covenants are not limited to any particular job title but rather apply during and after an employee's period "of employment with the Company". The change of title involved no dramatic change of function and therefore the Restrictive Covenants remain enforceable.

Defendants also assert that the Restrictive Covenants should not be enforced because Bio–Imaging committed a material breach of its agreement contained in its offer letter to Marchant. In that letter, Bio–Imaging stated: "During the first six months of your employment you shall receive a recoverable draw based on an expected annual commission payout of $40,000". Defendants contend that provision constituted a promise to pay Marchant a $40,000 recoverable draw which was, in fact, not paid.

Bio–Imaging responds that 1) the offer letter promised only to pay a $20,000 draw (half of an "expected annual commission") during the first six months, 2) they fulfilled that promise by paying Marchant $22,500 and 3) Marchant waived any material breach that may have occurred by not raising it for 11 years while both sides continued to perform under the employment contract. Because Marchant apparently received the draw as promised and any breach by Bio–Imaging has, in any event, been waived, this Court concludes that the Restrictive Covenants are enforceable.

### c. Breach of the Restrictive Covenants

In addition to demonstrating that the Restrictive Covenants are enforceable, Bio–Imaging must also show that Marchant's employment in a competitive position at M2S would breach them. In that regard, Bio–Imaging has shown that M2S is a direct competitor. Both Bio–Imaging and M2S provide medical imaging services for clinical trials. Defendants argue that M2S focuses on smaller clinical trials in earlier Phases of testing and primarily on medical device companies as opposed to pharmaceuticals but M2S' own website indicates that it offers imaging services across all therapeutic areas and Phases of clinical testing and that its business is rapidly expanding. Because M2S is a di-

rect competitor of Bio–Imaging, this Court finds that Marchant's employment by M2S in a competitive position would violate the Non–Competition Covenant and is sufficient ground to enjoin Marchant from commencing such employment.

## 2. Irreparable Harm

As well as demonstrating a likelihood of success on the merits, Bio–Imaging must also show "a significant risk of irreparable harm if the injunction is withheld". *See Nieves–Márquez,* 353 F.3d at 120. Irreparable harm requires "an actual, viable, presently existing threat of serious harm". *Sierra Club v. Larson,* 769 F.Supp. 420, 422 (D.Mass.1991) (citation omitted). Furthermore the harm must be of a kind that cannot be redressed through money damages alone. *See id.* Such a showing has been made here.

Bio–Imaging has demonstrated that 1) Marchant had access to confidential information while employed at Bio–Imaging, 2) he was responsible for developing and maintaining customer relationships and 3) M2S is a competitor. Withholding injunctive relief and thereby permitting Marchant to commence a competitive position with M2S would therefore cause irreparable harm to Bio–Imaging.

By offering services that compete with Bio–Imaging, Marchant will likely cause Bio–Imaging to lose customers and business. Furthermore, as both parties acknowledge, there is a large degree of overlap in customers among medical imaging companies. It would be nearly impossible for Bio–Imaging to quantify the exact amount of lost business attributable to Marchant and thus injunctive relief is appropriate. *See Shipley,* 728 F.Supp. at 827 (finding irreparable harm where it would be "difficult, if not impossible" to determine which of defendant's new clients would have otherwise gone to his former employer).

## 3. Balance of Hardships

The imposition of a preliminary injunction is also appropriate here because Bio–Imaging has sufficiently shown that a balance of the hardships weighs in its favor. *See Nieves–Márquez,* 353 F.3d at 120. As explained above, Bio–Imaging will be irreparably harmed by Marchant assuming a competitive position at M2S. Defendants contend that the harm to Marchant will be greater because he will be foreclosed from working in the only line of business he knows for one year. That harm is, however, the consequence of enforcing any covenant not to compete and that "fact alone does not make such covenants unenforceable". *Marine Contractors, Co., Inc. v. Hurley,* 365 Mass. 280, 289, 310 N.E.2d 915 (1974). Marchant has voluntarily chosen to leave Bio–Imaging after freely entering into a non-compete agreement and being paid nearly $1.5 million during his 11 years of employment. Under these circumstances, the balance of hardships weighs in Bio–Imaging's favor.

## 4. Public Interest

The final factor in determining whether to grant a preliminary injunction is whether there is "a fit (or lack of friction) between the injunction and the public interest". *See Nieves–Márquez,* 353 F.3d at 120. Here the injunction serves the public interest in enforcing contractual arrangements. Defendants argue that public policy strongly favors the free alienability of employees which would be undermined by the imposition of an injunction. Enforcement of any covenant not to compete temporarily restricts the free alienability of employees but that alone is insufficient to abrogate a contract or render such covenants unenforceable. Accordingly, this Court finds that the public interest is not offended by the entry of a preliminary injunction here.

## ORDER

In accordance with the foregoing, Bio–Imaging's motion for preliminary injunction (Docket No. 13) is **ALLOWED.** The specifics are set forth in the accompanying injunction.

**So ordered.**