**Gary MARKOVITS, Plaintiff,**

v.

**VENTURE INFO CAPITAL, INC., Defendant.**

**No. 00 CIV. 3030 RWS.**

United States District Court, S.D. New York.

Feb. 1, 2001.

Lacaz Martins Srour & Fischer, New York City by Barry R. Fischer, Audrey Dursht, New York City, for Plaintiff and Third–Party Defendant Innovation Catalysts, Inc.

Layton, Brooks & Hecht, New York City by Daniel J. Brooks, Eamon Foley, for Defendant.

Galbut & Conant, Phoenix, AZ by Martin S. Galbut, for Third–Party Defendant Edison IP Partners, LLC.

## OPINION

SWEET, District Judge.

Defendant Venture Info Capital, Inc. ("VIC") has moved by order to show cause for a preliminary injunction preventing plaintiff Gary Markovits ("Markovits") from disclosing VIC's confidential information, and from competing with VIC, as per the terms of his employment and noncompetition agreement ("Employment Agreement"). Also pending is Markovits's motion for partial summary judgment to recover the value of his stock that was purchased by VIC in exercise of its option pursuant to the Employment Agreement and a Principal Shareholder's Stock Restriction Agreement ("Stock Agreement"), after terminating Markovits's employment. For the reasons set forth below, the motion for partial summary judgment will be granted, and the preliminary injunction motion will be granted in part.

### The Parties

Markovits is a New York resident who was one of the founders and a principal shareholder of VIC before his termination.

VIC is a Delaware corporation in the business of consulting with technology companies regarding the use and protection of their intellectual property. VIC now does business as the IP Capital Group.

Third-party defendant Innovation Catalysts, Inc. ("ICI") is a now-dissolved New York corporation of which Markovits was a principal.

Third-party defendant Edison IP Partners ("Edison") is a New York corporation of which Markovits is a principal.

## Facts

The following facts have been established in three days of factual hearings before this Court.

Markovits, one of the founders of VIC, signed the Employment Agreement on March 6, 2000. The Agreement provided, *inter alia*, that, as VIC's President and Vice President of Sales, Markovits would receive an annual salary of $200,000 plus benefits. Section 2.1 was a nondisclosure provision, which stated that Markovits,

> shall not disclose to any other person (except as required by applicable law or in connection with the performance of his duties and responsibilities hereunder), or use for the Employee's own benefit or gain, any Confidential Information relating to the business conducted by the Company.

Pltf. Mtn. Ex. B § 2.1. "Confidential information" was defined as including any information VIC treated as confidential, such as information regarding VIC's development and marketing activities, products, strategic plans, and clients, but not including publicly known information or information that comes to the employee's attention from a third party. *Id.* The nondisclosure provision applied indefinitely. *Id.*

Section 1.2 of the Agreement allowed VIC to terminate Markovits "for any reason at any time, *provided that* the Company pays to the Employee all Post Termination Payments." Pltf. Mtn. Ex. C. (Emphasis in original.)

Although Markovits's employment with VIC was "at will" pursuant to this Agreement, as this Court has previously held, *see* Brooks Aff. Ex. C at 9, the options available to both parties after his termination would depend on whether he was fired for cause. Pursuant to the Stock Agreement, VIC has the option to purchase 66.67% of the stock of a terminated employee at a price schedule that takes into consideration the reason for the termination and the length of employment.

Pltf. Mtn. Ex. A § 1.1. The Employment Agreement defines "Cause" as:

> (a) conviction of, or plea of "nolo contendere" to, a felony or other crime involving moral turpitude, (b) fraud, material dishonesty, embezzlement, or other material misappropriation of property by the Employee, (c) willful neglect of a defined duty or malfeasance ..., (d) willful failure to comply with the provisions of this Agreement including Section 2, and (e) willful failure to comply with the reasonable and lawful instructions of the Board of Directors consistent with the provisions of this Agreement, provided, however, that the Board of Directors first provides the Employee with a written notice setting forth in reasonable detail the nature of the noncompliance and the Employee is given a reasonable opportunity to comply after the initial noncompliance. *If the Company terminates the Employee for "Cause", the Company must provide notice to the Employee setting forth in reasonable detail the nature of such "Cause."*

Pltf. Mtn. Ex. C § 1.2 (emphasis added). Thus, termination for cause required notice to the employee.

If termination was without cause, the Employment Agreement allowed VIC to:

> elect, in its sole discretion, to enforce the provisions of Section 2.2 hereof for up to three (3) years from the date of such termination (the "Noncompetition Term"); *provided that* if the Company elects to enforce the provisions of Section 2, following the date of the Employee's termination without Cause, the Company shall (i) notify the Employee in writing of its election in accordance with the notice provisions set forth herein, (ii) pay to the Employee 50% of such Employee's base salary on a monthly basis and (iii) provide to the Employee, without cost, the health insurance and life insurance benefits set forth in Section 1.1.

Id. § 1.2 (emphasis in original). VIC could stop making these payments at any time during the three-year noncompetition term, and Markovits would no longer be bound by the noncompetition clause. *Id.*

Section 2.2 of the Employment Agreement is a restrictive covenant precluding Markovits from competing with VIC during his employment and for three years thereafter, in the 48 contiguous states and Canada. *Id.* § 2.2(c). Enumerated restricted activities include luring VIC employees away and encouraging any client or supplier to change or end its relationship with VIC.

The most sweeping section of the noncompete covenant is § 2.2(c), which bars employees from competing with VIC, "directly or indirectly . . . or undertak[ing] any planning for any business competitive with the Company or any of its affiliates." Restricted competition includes, and is not limited to,

> engag[ing] in any manner in any activity that is directly or indirectly competitive or potentially competitive with the business of the Company or any of its affiliates in the Restricted Territory as conducted or under consideration at any time during the Employment Term . . . [and] accepting employment or a consulting position with any person who is, or at any time within 24 months prior to termination of the Employee's employment has been or actively proposes to be, a customer of the Company or any of its affiliates.

*Id.*

With no prior notice, Markovits was terminated on April 5, 2000. Pursuant to the Employment Agreement, VIC has tendered 50% payment and continued Markovits's insurance benefits to enforce the noncompete clause. In addition, VIC exercised its option to purchase Markovits's stock. VIC invoked an option price of $0, the stated price after a for-cause termination pursuant to the Stock Agreement. If termination before March 15, 2001 were without cause, the Stock Agreement provides for an option price of $2.00. *Id.*

Markovits has returned all tendered post-termination payments. He filed the instant suit on April 20, 2000.

### Procedural History

VIC has moved for a preliminary injunction against Markovits on two previous occasions. Pursuant to VIC's order to show cause, this Court issued a temporary restraining order on May 26, 2000 enjoining Markovits from using VIC's laptop computer in any way. *See* Dkt. # 6. After conducting a show cause hearing on June 7, 2000, this Court issued a preliminary injunction on June 12, 2000, which required Markovits to return to VIC all of VIC's information and property in his possession, custody and control, including VIC's laptop.

In a subsequent motion filed in August 15, 2000, VIC moved for an order holding Markovits in contempt of the June 12, 2000 order, and for a preliminary injunction restraining Markovits from competing against VIC and compelling him to return the property that was the subject of the prior order. Markovits moved for partial summary judgment on the grounds that he had been wrongfully discharged and was therefore not subject to the terms of the Employment Agreement.

After conducting a factual hearing on September 28, November 13 and November 14, 2000, this Court made factual findings in open court. *See* Nov. 14, 2000 Tr. at 4–11. Specifically, it was found that Markovits had used VIC's computer after the injunction was issued, in contempt of this Court's order. In addition, it was found that Markovits had been an at-will employee and was still subject to the post-termination provisions of the contract after he was fired with "no notice" on April 5th, 2000. *Id.* at 7, 8. The board of directors did not meet to ratify the termination at that time, but VIC's general counsel sent Markovits a letter of termination on April 14, 2000, which was "on the basis of a

termination without cause." *Ibid.* A second letter was sent on April 26, 2000 "in which an effort to spell out cause was made." *Id.* at 8.

Furthermore, the Court found that "notice was required for termination with cause . . . [h]owever the termination here was clearly not for cause" because "[t]he employer has not met any of the conditions for such a termination . . . I do not think there was a discharge for cause. Maybe there could have been and very well could have been, but there was not." *Id.* at 9–10, 11.

Markovits was fined $10,000 for contempt plus $5,645.00, the cost of VIC's forensic expert, and the motion for partial summary judgment was denied in open court. An unpublished order to that effect was issued on December 5, 2000. In a second unpublished order of December 15, 2000, the motion for a preliminary injunction requiring Markovits to return VIC's property was granted, and leave to renew the motion for injunction regarding the noncompete clause was also granted. Specifically, the December 15 order required Markovits to return:

> all of VIC's property, including: all emails that were contained on VIC's laptop computer; all attachments to those emails; all proprietary methodologies, subject to any further hearing that may be required to define such material appropriate application plaintiff developed while employed by VIC; and all documents plaintiff created, in whole or in part, by copying VIC materials which were in his possession, and that plaintiff is enjoined and restrained from retaining copies, in any form, electronic or otherwise, of the VIC materials.

Dkt. # 38. The order required Markovits to return the property to VIC by January 2, 2000. Markovits sought an extension of this date, which the Court denied. However, the parties, upon their own agreement, extended the compliance date to January 4, 2000.

On December 26, 2000, Markovits filed the instant motion for partial summary judgment in the amount he claims is due for the purchase of his stock at VIC's option based upon his termination without cause. By order to show cause with a temporary restraining order of January 2, 2001, VIC sought a preliminary injunction requiring Markovits and those acting with him or under his control, such as ICI and Edison, to refrain from competing against VIC or disclosing VIC's confidential information. Finally, by order to show cause of January 9, 2001, VIC moved for an order adjudicating Markovits in contempt of the December 5, 2000 and December 15, 2000 orders. Response and reply briefs were received on each of these motions through January 10, 2001, and the motions were deemed fully submitted upon oral argument on January 19, 2001.

Markovits was held in contempt of the prior orders for belatedly paying the prior contempt penalty, and for retaining custody of "zipdisks" containing VIC proprietary information such as copies of emails and attachments that had been on VIC's laptop when it was under Markovits's control after his termination. Rather than returning this information to VIC as per the prior court order, Markovits had sent it to his attorney, who claimed a right to possess the information under the rules of discovery. On January 19, 2001, counsel for Markovits returned the zipdisks to the custody of VIC. Markovits was assessed a penalty in the amount of VIC's costs and attorneys' fees associated with bringing the contempt motion.

Therefore, only Markovits's partial summary judgment motion and VIC's preliminary injunction motions remain at issue here.

## Discussion

### I. *Partial Summary Judgment*

#### A. *Legal Standard*

A motion for summary judgment may be granted only when there is no issue of material fact remaining for trial and the

moving party is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ. P.; *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991). If, on the other hand, a reasonable finder of fact could return a verdict for the nonmoving party, there is a genuine factual dispute and summary judgment should not be granted. *See Zeevi v. Union Bank of Switzerland,* No. 89 Civ. 4637(MGC), 1992 WL 8347, *4 (S.D.N.Y. Jan. 14, 1992). "[T]he trial court's task at the summary judgment stage of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219 (2d Cir.1994).

### B. *Markovits is Entitled to Partial Summary Judgment*

The relevant question is whether Markovits was fired with or without cause, as this fact determines the price per share of Markovits's stock when VIC exercised its option under the Stock Agreement. If, as Markovits contends, he was fired without cause, the parties agree that he would be entitled to $2 per share for the 465,687 of his shares that VIC purchased, or a total of $931,274.00. On the other hand, if Markovits was terminated for cause, the Stock Agreement provides for a purchase price of $0. The parties agree that Massachusetts law governs the resolution of this question.

### 1. *The After–Acquired Evidence Doctrine Will Not be Applied*

█ VIC argues that the termination was for cause, citing various examples of Markovits's conduct that violated the terms of his Employment Agreement.[1] Although conceding that it had no knowledge of this fact prior to terminating Markovits, VIC argues that Massachusetts law recognizes the "after-acquired evidence" rule and allows employers to provide post-hoc justifications for for-cause terminations. *See, e.g., Marcus v. Boston Edison Co.,* 317 Mass. 1, 56 N.E.2d 910 (1944).

However, the after-acquired evidence doctrine, when applied in Massachusetts courts, is generally employed to justify wrongful terminations through evidence that the employee engaged in conduct that, although not known by the employer before termination, would have led to termination if known. *See id.,* 317 Mass. at 5–6, 56 N.E.2d at 912. The question at issue here is not whether there was cause in fact validating the termination; the parties agree that the termination was valid regardless of cause pursuant to Markovits's at-will employment. The relevant question here is rather whether Markovits was terminated for cause *pursuant to the contract,* such as to trigger the $0 stock price.

Section 1.1 of the Stock Agreement provides that the option price is $0 for terminations with "Cause as defined in the respective Employment Agreement." Pltf. Mtn. Ex. A § 1.1. As discussed above, the Employment Agreement required that "[i]f the Company terminates the Employee for 'Cause,' the Company must provide notice to the Employee setting forth in reasonable detail the nature of such 'Cause.'" *Id.* Ex. C § 1.2. Therefore, the factual

1. For example, VIC alleged that Markovits had in fact still been employed at Winstar when he signed the Employment Agreement with VIC, which violated the agreement. VIC argues that, although it did not discover this contractual overlap until some time after the termination, Markovits's dual employment subjected VIC to potential liability, because Winstar had a contractual right to claim ownership over all materials Markovits developed while in Winstar's employ. Additional grounds for Markovits's "for-cause" termination on April 5, 2000 are set forth in a July 11, 2000 notice attached to the VIC Board of Directors' written consent to termination. Brooks Aff. Ex. E.

question regarding cause raised by the after-acquired evidence is irrelevant if no notice was given, because without notice, there was no contractual "cause" justifying a $0 stock price.

### 2. *There Was No Notice for the Termination*

■ VIC argues that Markovits did receive notice, in the form of a letter dated December 18, 2000, more than eight months after his effective termination, advising him of the shareholders' decision to terminate his employment for cause as of April 5, 2000. Pltf. Resp. Mem. at 11.[2]

However, the contractual language requiring notice should be construed according to its plain meaning. *See Boston Edison Company v. Federal Energy Regulatory Commission*, 856 F.2d 361, 365 (1st Cir.1988) ("So long as the words of an agreement are plain and free from ambiguity, they must be construed in their ordinary and usual sense."); *Shane v. Winter Hill Federal Savings and Loan Association*, 397 Mass. 479, 485 492 N.E.2d 92, 95 (1986) ("a contract is to be construed to give reasonable effect to each of its provisions, if possible") (citation omitted). Black's Law Dictionary defines "notice" as "information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved, or informing him of some fact which it is his right to know and the duty of the notifying party to communicate." 5 Black's Law Dictionary 957 (1979).

A "warning" such as notice of termination simply cannot perform its function unless it is provided prior to the termination. Notice is ineffective unless it gives an employee time either to attempt to cure the problem, or to seek other employment before termination. VIC cites no authority in support of its contrary proposition. Therefore, pursuant to the plain meaning of the contractual language of the Employment Agreement, notice is a condition precedent to termination for cause. *See TaChotani v. Doubleclick, Inc.*, 2000 N.Y. Slip Op. 08523, 276 A.D.2d 313, 714 N.Y.S.2d 34, 36, (2000) (holding that "attempted retroactive termination is without effect" where employer failed to comply with contractual notice provision that was condition precedent to a for-cause termination). To hold otherwise would be to render the "notice" requirement a nullity, in violation of fundamental contract construction principles. *See, e.g., Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 54 (1st Cir.1996) ("no part of [a] contract should be deemed superfluous") (*citing Merchants National Bank v. Stone*, 296 Mass. 243, 5 N.E.2d 430, 433 (1936)); *Shea v. Bay State Gas Co.*, 383 Mass. 218, 225, 418 N.E.2d 597 (1981) (holding that whenever possible, a contract must not be construed so as to render any of its terms meaningless).

Where, as here, "a condition is required by the agreement of the parties . . . a rule of strict compliance traditionally applies." Farnsworth, Contracts § 8.3, at 571 (1990). As this Court has previously held, the fact that no notice was provided precluded a for-cause termination under § 1.2 of the Employment Agreement, notwithstanding the existence of cause in fact. *See* Nov. 14, 2000 Tr. at 7–11.

Markovits was terminated without cause, as that term is defined in his Employment Agreement.[3] VIC exercised its

---

2. This letter was apparently prepared as a direct result of this Court's finding on November 14, 2000 that the termination was without cause because no notice had been provided due to a lack of board action. The letter attached the VIC Board's written consent to termination, dated July 11, 2000. Brooks Aff. Ex. E.

3. Section 1.2 of the Employment Agreement allows VIC to invoke the noncompete covenant by tendering 50% of Markovits's salary and continuing his benefits on notice only in the event of a termination "without Cause." Pltf. Mtn. Ex. C § 1.2. By tendering these funds as a precondition to invoking the non-

option to purchase 66.67% of his shares pursuant to the Stock Agreement, and erroneously invoked a "for-cause" option price of $0 per share. Therefore, no material facts relevant to the stock price due are in dispute, and partial summary judgment is appropriate. As a result, VIC is liable to Markovits in the amount of $2 per share, or $931,274.00.

The plaintiff's motion for partial summary judgment is granted.

## II. *Preliminary Injunction*

VIC seeks a preliminary injunction (1) enjoining Markovits from disclosing or using VIC's confidential information for the benefit or gain of himself, ICI or Edison; and (2) enjoining Markovits, ICI and Edison from competing against VIC, as per the terms of Markovits's Employment Agreement. Markovits, on the other hand, contends that an injunction is inappropriate, because he has now complied with the December 15, 2000 injunction requiring him to return to VIC all of its proprietary information, a noncompete injunction would be disproportionate with his term of employ, and a noncompete injunction would prevent him from earning a living. Finally, Edison contends that it should not be subject to an injunction because it is not competing unfairly, and has no contractual obligation not to compete against VIC.

### A. *Legal Standard*

■ In order to justify the issuance of a preliminary injunction, a movant has the burden of proving two factors: First, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995) (*citing Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985)). Irreparable harm is that injury which is so serious that "a

monetary award cannot be adequate compensation." *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985); *see also Warner–Lambert Co. v. Northside Development Corp.*, 86 F.3d 3, 8 (2d Cir.1996) (irreparable harm requirement may be met by showing that harm is unquantifiable in monetary terms). The specter of harm must not be "remote or speculative but actual and imminent." *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir.1995). Second, the movant must show either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation. *See Jayaraj*, 66 F.3d at 38.

### B. *Likelihood of Success on the Merits*

#### 1. *Markovits*

#### a. *VIC Has Met its Burden to Show that Markovits Has Disclosed VIC's Proprietary Information and Is Competing in Violation of the Covenant*

■ As discussed above, Markovits was terminated without cause. Therefore, the noncompete covenant went into effect as against Markovits pursuant to §§ 1.2 and 2.2 of his Employment Agreement. This Court has already enjoined Markovits from employing any of VIC's proprietary information, and ordered him to return any such materials—an injunction Markovits has violated and been found in contempt of as a result, although he has subsequently returned the last of VIC's property.

The evidence has established that, notwithstanding the noncompete and nondisclosure covenants, Markovits and his two newly formed companies, the now-defunct ICI, and its successor corporation, Edison, have used VIC's proprietary materials to compete.

compete clause, VIC has effectively admitted          that Markovits was terminated without cause.

ICI's business plan specifically names VIC as a "direct competitor," Brooks Aff. Ex. I at 5–6. The companies perform substantially the same functions: they each function as consultants with methodologies for comprehensively documenting and evaluating clients' intellectual property and devising a portfolio of proprietary information to increase the innovation and earnings potential of technology-related companies. The only substantive differences between VIC and Edison, according to Vincent Marold ("Marold"), Edison's co-founder, are that Edison, unlike VIC, does not directly invest in its client companies or offer to prosecute patents. Marold Decl. ¶¶ 18, 19. In addition, Markovits testified that VIC, unlike ICI or Edison, used a creative problem solving technique named CPS. Brooks Aff. Ex. Q at 122–23.

The VIC Methodology combines works from the public domain in what VIC claims is a unique product. See Brooks Aff. Ex. Q at 231. In order to protect such proprietary information as the Methodology, VIC does not share it with outside entities without a nondisclosure or confidentiality agreement. Id. at 231–35. As the Court has previously found, extensive portions of the VIC Methodology have been cloned and promoted as the ICI Methodology, see Nov. 13, 2000 Tr. at 104; Nov. 14, 2000 Tr. at 8–9; compare Brooks Aff. Ex. H with id. Ex. I, which has subsequently been adopted by Edison, Brooks Aff. Ex. J at M0390.[4] See also id. Exs. K, L, M (emails from Markovits to Marold detailing the process of shifting ICI business to Edison). In addition, Edison's Business Plan includes use of an Innovation Scan, a four-tiered proprietary methodology that exactly duplicates—both in name and in substance—the Innovation Scan Markovits developed while at VIC. See Brooks Aff.

Exs. J, N App. 1, Q at 43–48, 269–70. Although VIC did not incorporate this particular concept into its methodology, it was nonetheless assigned to VIC as confidential information pursuant to the Employment Agreement.

That Markovits may have developed some of these concepts, or that VIC did not incorporate them into its methodology, is of no consequence, because he signed an enforceable contract that assigned to VIC his rights in "inventions, discoveries, developments, improvements, programs and concepts" produced during the employment term. Deft. Mtn. Ex. B § 2.3. This clause is effective regardless of whether VIC incorporates Markovits's ideas into its consulting repertoire.

Markovits has therefore shown a likelihood of success on the merits of the nondisclosure issue, as against both Markovits and Edison, which gained access to VIC's confidential information only due to Markovits's contractual breach. See Dickerman Associates, Inc. v. Tiverton Bottled Gas Co., 594 F.Supp. 30, 36 (D.Mass.1984) (approving nondisclosure injunction against new employer for misappropriation of former employer's confidential due to employee's violation of confidentiality agreement).

Although the facts set forth above demonstrate that Markovits is also continuing to compete against VIC, Markovits alleges that a noncompete injunction should not issue because the covenant is unenforceable due to its sweeping breadth as to restricted activities, geographic scope, and duration.

**b. An Injunction Will Protect VIC's Legitimate Business Interests**

The injunction VIC seeks is intended not to prevent Markovits from engaging in

---

4. Vincent Marold, a co-founder of Edison, alleges that the inclusion of the "ICI Methodology" in Edison's IP business plan was a "typographical error," and that every effort was made to deny VIC the ability to argue that improper use of its materials had taken place. Marold Decl. ¶¶ 4,5. During the course of this litigation, the approximately

twenty paragraphs of ICI's Business Plan that were duplicative of VIC's have been transformed and reduced, in Edison's final Business Plan, to approximately seventeen lines in an attempt to avoid an injunction. Compare Brooks Aff. Ex. H with Ex. I and Supp. Marold Decl. ¶¶ 1–4, Exs. 1–2.

"ordinary competition," as Markovits alleges, but rather to protect VIC's legitimate business interest in retaining its good will,[5] reputation, and proprietary information. *See Marcam Corporation v. Orchard,* 885 F.Supp. 294, 298 (D.Mass.1995); *Kroeger v. The Stop & Shop Companies, Inc.,* 13 Mass.App.Ct. 310, 432 N.E.2d 566 (1982).

VIC introduced evidence that Markovits has persisted in representing ICI and Edison to clients by claiming VIC's confidential information as his own, confusing clients as to which company in fact has had success with the methodology in the past. For example, Markovits admitted during the hearing that, on behalf of ICI, he solicited a company named IdeaLabs by misrepresenting that a prior project of VIC's for Western Digital was conducted by ICI. Brooks Aff. Ex. Q at 67–8. Such misrepresentations can only bolster ICI at VIC's expense. VIC has a legitimate business interest in enjoining such tactics.

■■■■ Contrary to Markovits's assertion, noncompete covenants are enforceable under Massachusetts law even where no trade secrets are involved. *See Evlek,* 122 F.Supp.2d at 379 (*citing New England Canteen Serv., Inc. v. Ashley,* 372 Mass. 671, 363 N.E.2d 526, 528 (1977)); *Shipley Co., Inc. v. Clark,* 728 F.Supp. 818, 826–28 (D.Mass.1990).[6] As Massachusetts courts recognize, "[i]t is difficult to conceive how all of the information stored in [employ-

ee's] memory can be set aside as he applies himself to a competitor's business and its products." *Marcam,* 885 F.Supp. at 297–98. Where a former high-level employee of a specialized company has knowledge of marketing strategies and plans for future development, "he does not go with a tabula rasa with respect to [the former employer's] products," and the former employer has a legitimate interest in protecting against the "inevitable use" of its proprietary information that can be enforced by means of an injunction. *Id.,* 885 F.Supp. at 297. Given that courts have issued injunctions based upon the structural inevitability of such unfair competition, an injunction is even more appropriate where it has been proven that the employee has in fact willfully cloned the former employer's proprietary materials for use by a direct competitor. *See, e.g., Bard v. Intoccia,* No. 94–11568, 1994 WL 601944, at *3 (D.Mass. Oct. 13, 1994) ("Although I fully credit [employee's] testimony that he took no documents that could in any way compromise the plaintiff, he could not and did not leave behind his special knowledge of plaintiff's operation, and in service his new employer he will inevitably draw upon that knowledge.").

■■■ Markovits and Edison note that there are 10,000 potential clients in the field Edison and VIC work in, and suggest that a injunction against competition is

---

**5.** "Good will consists of the company's positive reputation in the community, particularly in the eyes of its customers and potential customers, ... and [its] relations with the corporate clients." *Garber Bros. v. Evlek,* 122 F.Supp.2d 375, 380 (E.D.N.Y.2000) (citations and internal quotations omitted).

**6.** A trade secret is any formula or combination of information that is used in a business and gives its owner a competitive advantage over others in the marketplace who do not have access to it. *See North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999) (*quoting* Restatement of Torts, § 757 cmt. b (1939)); *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir.1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998). "A trade secret can exist in a

combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 174 (2d Cir.1990) (internal citation omitted). In deciding whether information or methodologies constitute trade secrets, courts should consider the value of the information, its availability from other sources, and the extent of the owner's attempts to keep it secret. *See Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 918, 624 N.E.2d 1007 (1993) (*quoting* Restatement of Torts § 757 cmt. b); *accord Haber,* 188 F.3d at 44.

unnecessary when considering the capabilities of two relatively small companies in such a broad field. In other circumstances, this argument might carry some weight. However, Edison's client list overlaps significantly with VIC's, including HP, New Focus, Yafo, Princeton Lightwave, Freewire, and Silicon Valley Bank, whom Markovits first approached on behalf of VIC. Brooks Aff. (Ex. Q at 78, 106, 242). As VIC argues, this state of affairs is "somewhat suspicious," particularly in light of the fact that Markovits initially contacted them on VIC's behalf. Deft. Reply Inj. Mem. at 7 n. 7.[7] An injunction against competition is necessary where, as here, a former employee has appropriated and disclosed his former employer's confidential information, and then, on behalf of a direct competitor, compounded that violation by targeting the clients and business leads of the former employer rather than the more than ninety-eight hundred other businesses in the field. *See, e.g., Ecolab Inc. v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y.1991) (noting that use of former employer's confidential information to solicit future clients on behalf of competitor is to be enjoined as unfair competition).

In sum, Markovits's insistent use of VIC's materials in soliciting clients approached by VIC, requires that the Court issue a noncompete injunction.

### c. Markovits Will Be Enjoined from Competing with VIC in the Contiguous United States for Two Years from the Date of Termination

■ The validity of a noncompete covenant in Massachusetts depends on whether it "is reasonably limited in time and space, and is consonant with the public interest." *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 175 N.E.2d 374, 375 (1961); *see*

*also Marcam*, 885 F.Supp. at 299 ("To be enforceable, however, a non-competition agreement must be reasonable in terms of its restrictions as to time, location, and other respects.").

■ Rather than invalidating an overbroad noncompete provision, Massachusetts law allows a district court the discretion to enforce it "to the extent that it is reasonable." *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1469 (1st Cir.1992) (*quoting L.G. Balfour Co. v. McGinnis*, 759 F.Supp. 840, 845 (D.D.C.1991)); *see also Pettingell v. Morrison, Mahoney & Miller*, 426 Mass. 253, 255, 687 N.E.2d 1237, 1239 (1997) ("We generally enforce noncompetition agreements between employers and former employees to the extent they are reasonable."). *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778–79, 308 N.E.2d 481, 485–86 (Mass.1974) (upholding two-year covenant not to compete but restricting geographical area to territory serviced by salesman prior to termination).[8] In choosing how narrowly to enforce a noncompete covenant, courts "must be vigilant to protect employees against overbroad and oppressive restrictions on their ability to work and earn a living, but must temper their vigilance with an awareness that employers, too, work for a living and are entitled to reasonable protection against the predations of unscrupulous former employees." *Ferrofluidics*, 968 F.2d at 1471.

■ The noncompete covenant in the Employment Agreement essentially precludes Markovits from engaging in any competition against VIC in the 48 contiguous states and Canada, for a period of three years from the date of his termination, as long as VIC continues to pay him 50% of his $200,000 salary plus health benefits. Pltf. Mtn. Ex. C § 2.2.

---

7. However, Marold justifies the overlap with regard to both Silicon Valley Bank and CNF Technologies, Inc. by stating that he, not Markovits, introduced them to VIC. Marold Decl. ¶¶ 15, 17. This statement is unrebutted.

8. New York courts, too, observe this rule. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 73 (2d Cir.1999) ("The main limitation on covenants not to compete is that they will be enforced only to the extent necessary to protect the employer's legitimate interests.").

### i. *Geographical Scope*

Markovits contends that the provision barring him from competing with VIC anywhere in the 48 contiguous United States or Canada is overbroad. Enforcing nationwide noncompete provisions is appropriate if there is a relationship between that scope and the business of the company sought to be protected. *See Marcam*, 885 F.Supp. at 294 (granting injunction against competition in United States, its possessions and territories); *Weseley Software Development Corp. v. Burdette*, 977 F.Supp. 137, 144 (D.Conn.1997) (upholding restrictive covenant in United States and Canada, where employer did business); *Business Intelligence Services, Inc. v. Hudson*, 580 F.Supp. 1068, 1070, 1073 (S.D.N.Y.1984).

One important factor in considering the reasonableness of this restraint is whether it correlates to the geographic scope of VIC's established business. *See All Stainless, Inc. v. Colby*, 364 Mass. 773, 308 N.E.2d 481 (reducing scope of noncompete covenant to comport with sales territory of former employee.); *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 289, 310 N.E.2d 915, 921 (1974) ("The geographical scope of the agreement coincides with the area in which Marine performs almost all of its work, and thus is precisely drawn to protect Marine's good will."). Edison's promotional materials allege that there was no fear of Edison and VIC competing for the same clients because VIC was limited by its choice to locate its primary office in Vermont. *Id.* Ex. K at M0565. However, as Markovits knew, VIC was in the process of opening a New York office during his tenure there, an undertaking that was completed after his termination. *Id.* Ex. E at 241, 265. VIC has presented unrebutted testimony that it has offices in Vermont, New York, and California, and is engaged in projects with companies nationwide. Brooks Aff. Exs. E at 241, Q at 147. No evidence has been introduced to suggest that VIC does business in Canada. A noncompetition covenant, drawn more narrowly, might serve the interests of both VIC and Markovits, given the number of potential clients, and their geographic and business diversity. However, such a wholesale rewriting of the Employment Agreement by the Court would seem inappropriate in this case.

As a result, enjoining Markovits from competing with VIC in the 48 contiguous states is appropriate and in keeping with the scope of VIC's business.

### ii. *Duration*

Finally, Markovits contends that the three-year duration of the covenant is excessive, in part because it is disproportionate to the three weeks during which he was employed pursuant to the Employment Agreement. Although many courts have upheld three-year noncompete covenants, Markovits contends that those cases are distinguishable because those employees had been employed for much longer terms. *See, e.g., Ferrofluidics*, 968 F.2d at 1471. (upholding district court's revision of noncompete clause from five to three years for five-year employee); *Hurley*, 365 Mass. at 290, 310 N.E.2d at 921 (upholding district court's revision of covenant from five to three years as reasonable against seven-year employee, where decree granting specific performance did not issue for two years after termination, during which employee had been actively competing).

However, the Massachusetts Supreme Judicial Court has rejected this view, stating that "we are aware of no authority which would support the denial of injunctive relief because the contractual term of employment was short in relation to the duration of the intended noncompetitive restraint. The term of employment has not been a factor in our cases involving enforcement of noncompetition agreements of this type." *See All Stainless*, 364 Mass. at 779, 308 N.E.2d at 485–86.

The reasonableness of the duration of a noncompete covenant depends, in light of all the circumstances, on whether the restraint advances legitimate business inter-

ests without being oppressive. *Ferrofluidics*, 968 F.2d at 1470. Massachusetts courts considering noncompetition covenants involving highly placed employees in specialized fields have upheld one-year restrictions on competition where, as here, the employee had access to confidential information. *See, e.g., Shipley Co., LLC v. Kozlowski*, 926 F.Supp. 28, 30 (D.Mass. 1996) (upholding one-year noncompete provision against employee in highly competitive photoresist field went to work for competitor and "suspiciously accessed and copied confidential information from the plaintiff's computerized data base."); *EMC Corp. v. Allen*, 1997 WL 1366836, *1 (Mass.Super.1997) (upholding one-year noncompete covenant in view of employee's high-level position at former employer and access to confidential and proprietary information relating to EMC's product and marketing plans for the next year).

In consideration of the nature of VIC's business, Markovits's access to confidential information and persistent abuse of non-disclosure agreements, and the impact noncompetition will have on Markovits, a two-year noncompetition term will be imposed. This term—which in practice will amount to just over one year, as the term runs from April 5, 2000, the date of termination—is in keeping with prior injunctions in similar circumstances.

Restricting Markovits from competing against VIC for two years will not be an undue financial burden. The Employment Agreement and Stock Agreement are designed in such a manner that a former employee will be financially supported regardless of the manner of his termination. If termination is for cause, the employee is free to seek employment with VIC's competitors. If termination is without cause, the employee may not compete but will receive half his annual salary plus benefits, in addition to $2 per share for his stock, when purchased at VIC's option. For Markovits, this provision means that he will receive $100,000 a year during this term pursuant to § 1.2 of the Employment

Agreement, in addition to almost $1 million in payment for his shares of VIC stock. The average annual payment·of approximately $600,000 over the two years of the noncompetition term is certainly reasonable in light of Markovits's previous annual salary of $200,000.

Therefore, as the noncompete covenant is enforceable to the extent just stated, and the prerequisites to enforcing the covenant—termination without cause, notice of election and tender of 50% salary as per § 1.2 of the Employment Agreement—have been met, VIC has shown a likelihood of success on the merits against Markovits on the noncompete covenant.

### 2. *Edison*

■ Edison argues that as a non-party to the Employment Agreement, it cannot be bound to Markovits's noncompete covenant. VIC has cited no cases in which a new employer has been enjoined from *competing* against its employee's former employer, as distinct from *employing materials* wrongfully disclosed by the employee in violation of a confidentiality agreement. As stated above, the noncompetition injunction against Markovits is necessary in order to ensure that he does not continue to pass on VIC's confidential information to direct competitors such as Edison in violation of both the nondisclosure and noncompete provisions of his contract and of the nondisclosure injunction. While Edison may compete with VIC, neither Markovits nor any agent of Markovits may do so.

Therefore, the motion to enjoin Edison from competing against Edison is denied.

### C. *VIC Has Demonstrated the Likelihood of Irreparable Harm*

■ VIC submits several arguments in support of the proposition that it would suffer irreparable harm if a preliminary injunction did not issue. First, VIC points to a provision in the Employment Agreement in which Markovits "acknowledged"

that "immediate and irreparable damage ... would be caused to the Company for which it may have no other adequate remedy, in the event of a breach by [Markovits] of any of the covenants in ... Section 2...." Pltf. Mtn. Ex. C § 2.5; Deft. Resp. Mem. at 9.

While this provision does weigh in VIC's favor, without more, it is merely one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue. *See North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir.1999) (finding irreparable harm on basis of both contractual provision and impossibility of measuring harm in loss of trade secrets in monetary terms); *Ticor Title*, 173 F.3d at 69 (finding irreparable harm on basis of both contractual provision and difficulty in calculating monetary damages sufficient to compensate for the loss of a client due the breach of a noncompete clause); *Baker's Aid, a Division of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir.1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); *Smith, Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C.Cir. 1996) (contractual provision stipulating to irreparable harm is an "insufficient prop"); *International Ass'n of Plumbing and Mechanical Officials v. International Conference of Bldg. Officials*, 79 F.3d 1153, 1996 WL 117447, *2 n. 3 (9th Cir.1996) (table) ("While the court may rely on the contractual provision as evidence of irreparable injury, it may not abrogate its obligation to make this finding solely by pointing to the fact that one of the parties to a contract has conceded that such an injury would be irreparable.").

VIC correctly argues that it would be difficult, if not impossible, to enumerate monetary damages for the harm it would suffer absent an injunction. *See Clark*, 728 F.Supp. at 827 ("the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one") (*quoting Kroeger*, 13 Mass.App.Ct. 310, 432 N.E.2d 566). As discussed above, Markovits and Edison's continued use of VIC's confidential information, and Markovits's inevitable competition based thereon, will likely cause serious damage to VIC's reputation and client base, as well as to the value of the VIC materials themselves. The measure of this damage is simply unquantifiable.

### D. The Balance of Harms Supports the Injunction

Finally, the harm to VIC if an injunction were not issued, would be substantial and irreparable, and would outweigh any harm that would flow to Markovits if the injunction were granted. While VIC would likely suffer harm threatening its viability in the marketplace, Markovits will be compensated with $100,000 a year plus benefits for the two-year term, and may supplement this figure in any non-competitive venture. In addition, he will have access to almost $1 million to which he would not be entitled if he were not bound by the noncompete restriction.

### Conclusion

For the foregoing reasons, Markovits is granted partial summary judgment in the amount of $931,274.00. However, Markovits and Edison shall be enjoined from disclosing or employing any of VIC's confidential information, as defined in the Employment Agreement. Finally, Markovits shall be enjoined from competing against VIC in the contiguous United States until April 5, 2002.

Settle order on notice.

It is so ordered.